## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**XXX XXX XXXX AVENUE, NW, #XXX, WASHINGTON, D.C. XXXXX** | **Mag. No. _____** |
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**STORAGE UNIT #XX, LOCATED ON THE THIRD FLOOR OF XXX XXX XXXX AVENUE, NW, WASHINGTON, D.C. XXXXX** | **Mag. No. _____** |
| **IN THE MATTER OF THE SEARCH OF:**<br><br>**A 2017 WHITE HYUNDAI ELANTRA SEDAN BEARING VIN NUMBER XXXXXXXXXXXXXXXXX AND WASHINGTON, D.C. TAG XXXXXX** | **Mag. No. _____** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jason R. Bell, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as XXX XXX XXXX Avenue, XX, #XXX, Washington, D.C. XXXXX, hereinafter "PREMISES," further described in Attachment A-1 (incorporated herein by reference); a 2017 White Hyundai Elantra Sedan bearing VIN number XXXXXXXXXXXXXXXXX and Washington, D.C. tag XXXXXX,

hereinafter "VEHICLE," further described in Attachment A-2 (incorporated herein by reference); and, storage unit #XX, which is located at XXX XXX XXXX Avenue, XX,#XXX, Washington, D.C. XXXXX, hereinafter "STORAGE UNIT," further described in Attachment A-3 (incorporated herein by reference), for the things described in Attachment B (incorporated here by reference).

2.     I am a Captain with the United States Capitol Police (the "USCP"), where I have served since April 7, 2002.  I am currently assigned to the Investigations Division.  I have attended the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have received training and gained experience in search and arrest warrant applications, the executions of searches and seizures, computer crimes, computer evidence identification, computer evidence seizure and processing, and various other relevant training.     As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 119 (Making Public Restricted Personal Information), 18 U.S.C. § 875(d) (Threats in Interstate Communications), 18 U.S.C. § 1030(a)(3) (Unauthorized Access of a Government Computer), 18 U.S.C. § 1028(a)(7) (Identity Theft), and 18 U.S.C. § 1512(b)(3) (Witness Tampering), D.C. Code § 22-801(b) (Second Degree Burglary), D.C. Code § 22-3302(b) (Unlawful Entry) have been committed by Jackson

Alexander Cosko ("COSKO").  Section 119 of Title 18 of the United States Code imposes criminal penalties on whoever makes public restricted personal information of certain covered individuals, including U.S. government employees and officers.  Section 875(d) of Title 18 of the United States Code imposes criminal penalties on whoever "with intent to extort from any person . . . any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another."  Section 1030(a)(3) of Title 18 of the United States Code imposes criminal penalties on whoever intentionally accesses a government-owned computer without authorization or exceeds authorized access.  Section 1028(a)(7) of Title 18 of the United States Code imposes criminal penalties on whoever "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, or in connection with, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law."  Section 1512(b)(3) of Title 18 of the United States Code imposes criminal penalties on "[w]hoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, . . . with intent to (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense."  Section 801(b) of Title 22 of the D.C. Code imposes criminal penalties on "whoever shall . . . break and enter, or enter without breaking, any dwelling . . . or other building . . . , whether at the time occupied or not . . . with intent to break and carry away any part thereof or any fixture or other thing attached to or connected with the same, or to commit any criminal offense".  Section 3302(b) of Title 22 of the D.C. Code imposes criminal penalties for "[a]ny person who, without

3

lawful authority, shall enter, or attempt to enter, any public building, or other property, or part of

such building, or other property, against the will of the lawful occupant or of the person lawfully

in charge thereof or his or her agent[.]"

## PROBABLE CAUSE

### September 27: The Restricted Personal Information of Three United States Senators Was Published On Wikipedia.org

5.      As background, Wikipedia is an online encyclopedia that is accessible to the

public at www.wikipedia.org.  Wikipedia invites crowd-editing, that is, it permits members of

the public not only to view the contents of its encyclopedia entries (or "pages"), but also to edit

them.  Wikipedia maintains certain records concerning edits to its pages, including records of the

Internet Protocol ("IP") addresses associated with particular edits.

6.      On or about September 27, 2018, staff of U.S. Senator 1 contacted the USCP

Threat Assessment Section ("USCP TAS") to report that unknown person/persons edited the

Wikipedia page for U.S Senator 1.  The Senator's staff reported that U.S. Senator 1's restricted

personal information (including the Senator's private home addresses, personal cell phone

numbers, and office numbers) had been published on Wikipedia.  U.S. Senator 1 staff provided

USCP TAS with a screen shot of the Wikipedia post.

7.      A review of the screen shot revealed that the Wikipedia page for U.S. Senator 1

had been edited to include U.S. Senator 1's personal information (as described above) on

September 27, 2018, at 21:13 UTC (5:13 p.m. Eastern), using the IP address 143.231.249.130

(the ".130 IP address").

8.      On September 27, 2018, USCP TAS was contacted by the staff of U.S Senator 6, who reported the publication of U.S. Senator 1's information, as well as the publication, on Wikipedia, of restricted personal information of two other U.S. Senators.

9.      Specifically, U.S. Senator 6's staff reported that restricted personal information belonging to U.S. Senator 2 and U.S Senator 3 had been published on Wikipedia.  U.S. Senator 6's staff provided screen shots of the three edited Wikipedia pages that were the subject of their report.

10.     A review of the Wikipedia screen shot of U.S. Senator 2's Wikipedia page revealed that the page had been edited on September 27, 2018, at 21:25 UTC (5:25 p.m. Eastern), using the .130 IP address.  Specifically, the page had been edited to publish U.S. Senator 2's restricted personal information, including, among other things, U.S. Senator 2's home address and home telephone number.

11.     A review of the Wikipedia screen shot of U.S. Senator 3's Wikipedia page revealed that the page had been edited on September 27, 2018, at 21:54 UTC (5:54 p.m. Eastern), using the IP address 143.231.249.136 (the ".136 IP address").  Specifically, the page had been edited to publish U.S. Senator 3's restricted personal information, including, among other things, U.S. Senator 3's home address and home telephone number.

12.     The above-described edits to the Wikipedia pages of U.S. Senators 1, 2, and 3 occurred roughly contemporaneously with public – and highly publicized – Senate proceedings related to a nomination for the U.S. Supreme Court.  That nomination was and is pending before the Senate at all relevant times herein.

13.     An open source search of the .130 and .136 IP addresses revealed that both IP addresses belong to the U.S. House of Representatives in Washington, DC.

14.     USCP contacted the House of Representatives Security Operations Center ("SOC") to request a search of network activity using those two IP addresses, to determine whether a valid account user could be associated with those IP addresses.  The SOC determined that the .130 IP address was assigned to the open Wi-Fi network assigned to the House of Representatives.  Based on my training and experience, I know that this indicates that, at the time that the restricted personal information of U.S. Senators 1 and 2 was published on Wikipedia, the actor was using a portable computer device that connected to the internet (and Wikipedia) through the .130 IP address.

15.     The SOC determined that the .136 IP address was assigned to a House of Representatives wired network.  Based on my training and experience, I know that this indicates that, at the time that the restricted personal information of U.S. Senator 3 was published on Wikipedia, the actor was connected to the internet (and Wikipedia) using a valid House of Representatives user account.

<u>October 1: The Restricted Personal Information of Two Additional United States Senators Was Published On Wikipedia.org</u>

16.     On October 1, 2018, USCP TAS was contacted by Witness 1, a staff member for U.S. Senator 4, who reported observing Twitter postings showing that the restricted personal information of U.S. Senator 5 and U.S. Senator 4 had been published on Wikipedia.  Witness 1 provided USCP TAS with screen shots of the Wikipedia pages.

17.     A review of the screen shot of the Wikipedia page for U.S. Senator 5 revealed that the page had been edited on October 1, 2018, at 21:52 UTC (5:52 p.m. Eastern), using the IP

address 156.33.195.125 (the ".125 IP address").   Specifically, the page had been edited to publish restricted personal information belonging to U.S. Senator 5, including, among other things, U.S. Senator 5's home address and home telephone number.

18.      A review of the screen shot of the Wikipedia page for U.S. Senator 4 revealed that the page had been edited on October 1, 2018, at 21:50 UTC (5:50 p.m. Eastern), using the .125 IP address.   The screen shot also showed that the edit had been a "mobile edit" which indicates that a mobile device (rather than a desktop computer) was used to make the edit.   The screen shot further showed that the page had been edited to publish restricted personal information belonging to U.S. Senator 4, including, among other things, U.S. Senator 4's home address and home telephone number.

19.      Further review of the screen shot of the Wikipedia page for U.S. Senator 4 revealed that the following statements were also included in the edit of the page:

   a.   "He dares call for an investigation of ME?!?!?!?"

   b.   "I am the Golden God!"

   c.   "Also It's my legal right as an American to post his info."

   d.   "We are malicious and hostile"

   e.   "Send us bitcoins"

   f.   "Wednesday night will be the doxxed next."

20.      USCP TAS conducted an open source search of the .125 IP address, which revealed that the .125 IP address belonged to the open Wi-Fi network of the U.S. Senate in Washington, DC.

21.     The Senate Chief Information Officer reported to USCP that the above-described activity was conducted using mobile devices which had been connected to the Senate Guest Wi-Fi network, and which had the following identifying information:

- 192.168.80.108; MAC address: C8:D0:83:99:7A:25; Apple

- 192.168.94.241; MAC address: A4:08:EA:8F:8D:25; Murata Technologies

<u>Investigation Reveals that COSKO Is Involved in Publishing U.S. Senator 3's Restricted Personal Information on Wikipedia</u>

22.     The SOC conducted further analysis of the .136 IP address to determine the identity of the relevant user. The SOC found that the computer workstation identified as TX18DC154 had connected to Wikipedia.org during the time that U.S. Senator 3's restricted personal information was published on Wikipedia on September 27, 2018.  That is, at the time that U.S. Senator 3's restricted personal information was published on Wikipedia using the .136 IP address, computer workstation TX18DC154 was connected to Wikipedia using the .136 IP address. The SOC advised USCP that they used additional "House cybersecurity tools" which allowed them to identify the actual user who was logged on to computer workstation, TX18DC154.

23.     The SOC identified the user as Jackson Alexander Cosko, who the SOC confirmed was a current fellow working in the Washington DC office of U.S. Representative A, of the House of Representatives.  Based on my training and experience at the USCP, I know that House of Representatives computers are password protected, and that the SOC's determination meant that the computer had been accessed by someone who possessed COSKO's user identification and password

24.     The SOC advised that COSKO had logged into computer workstation TX18DC154 at 5:45:27 p.m. (Eastern), approximately nine (9) minutes before U.S. Senator 3's restricted personal information was published on Wikipedia (from the .136 IP address, which was being used by TX18DC154 at that time).

<u>October 2: COSKO Entered the Office of U.S. Senator 7 Without Authorization</u>

25.     On October 2, 2018 at approximately 10:27 p.m., USCP Communications received a call from Witness 2, a staff member for U.S. Senator 7.  Witness 2 reported that it had entered the Senator's office and observed COSKO in the Senator's office using the computer of Witness 3, another member of U.S. Senator 7's staff.  Witness 2 was familiar with COSKO, and immediately recognized COSKO in U.S. Senator 7's office.

26.     Witness 2 reported that COSKO was a former staff member with Senator 7's office. Witness 2 stated that COSKO'S employment with the Senator's office had ended several months ago – that is, that COSKO was asked to resign – and that COSKO did not have permission or authorization to be in the Senator's office on October 2, 2018.  Similarly, COSKO did not have permission or authorization to access or use Witness 3's government-owned computer in the Senator's office (or to otherwise access Witness 3's government account) on October 2, 2018.

27.     Witness 2 stated that, after Witness 2 confronted COSKO in the Senator's office, COSKO typed a few keys on the keyboard of the computer, grabbed something from the desk where the computer was located, got up, and left the office.

28.     Witness 2 then examined the computer.  The screen of the computer was dark.
Witness 2 hit a key, or moved the computer mouse, and the screen became active.  When the
screen became active, Witness 2 saw that the computer was logged into Witness 3's account.

29.     Shortly thereafter, Witness 3 returned to the desk and logged into the computer.
Witness 3 saw that there was a web application open, that Witness 3 did not recall ever using or
accessing.  Witness 3 stated that it did not believe that it had ever used that particular application.
Witness 3 further reported that it did not give COSKO permission to use its computer or login
credentials.  Based on my training and experience, and based on the above information from
Witness 2 and Witness, I believe that COSKO necessarily used Witness 3's login credentials to
access the computer.

30.     USCP reviewed surveillance footage that revealed that COSKO entered the
northwest door of the Dirksen Senator Office Building at approximately 10:10 p.m. after being
processed through security. COSKO also had a black backpack with him when he entered the
building.

31.      COSKO was later observed, on surveillance camera, exiting the same building
entrance at approximately 10:21 p.m. (Eastern) with the same black backpack in his possession.
Additional surveillance camera footage showed COSKO walking towards Union Station.


                          October 2: Threats and Witness Tampering

32.     Witness 2 further stated that, at approximately 10:25 p.m. (Eastern) on October 2,
2018, Witness 2 received a threatening email from xxxxxxxxxxxxx@gmail.com.  The email was

titled, "I own EVERYTHING."  The body of the email stated:  "If you tell anyone I will leak it all.  Emails signal conversations gmails.  Senators children's health information and socials."  Signal is a popular messaging application which enables chats/conversations.  In context, based on my training and experience, I believe that "socials" appears to be reference to social security numbers and/or other restricted personal information.  Based on my training and experience, I believe that a "gmail.com" email account is operated by Google LLC, and involves the use of Google email servers that are not located in Washington, DC.

<u>Information Related to the PREMISES, VEHICLE, and STORAGE UNIT</u>

33.     A review of public records revealed that XXX XXX XXXX Ave XX #XXX Washington, DC, is the current address for COSKO.

34.     USCP also conducted a license check, which revealed COSKO had a District of Columbia driver's license with the address XXX XXX XXXX Ave XX #XXX Washington, DC listed.

35.     COSKO was arrested based on probable cause on October 3, 2018.  Immediately prior to his arrest, members of the USCP observed COSCO exiting XXX XXX XXXX Avenue XX, Washington, DC, which is consistent with the above-listed address on COSKO's District of Columbia driver's license.

36.     Additionally, on or about October 3, 2018, agents from USCP met with a representative from the management company for the property located at XXX XXX XXXX Avenue, XX, in Washington, D.C.  That representative consented to allow USCP into certain common areas of the building, that is, the residents' parking garage and the area in which the storage units are housed.  Agents from USCP confirmed that the STORAGE UNIT is leased

from the management company to COSKO.  Additionally, agents confirmed that the VEHICLE is registered to COSKO.  USCP walked around the perimeter of the STORAGE UNIT and observed an ASUS computer, a computer monitor, and several boxes containing video game equipment.

<u>Digital Devices Constituting Evidence and Instrumentalities of the Offenses</u>

37.    Based on the foregoing information and the nature of the alleged offenses, I have reason to believe that evidence regarding offenses described herein may be found on electronic devices used by COSKO.

38.    The property to be searched includes the PREMISES, the VEHICLE, and the STORAGE UNIT, that is, all areas to which COSKO had personal access and which it is reasonable to believe he may have stored any digital devices capable of containing and which reasonably could contain evidence of the foregoing offenses (hereinafter the "TARGET DEVICE(S)").  Such devices include, but are not limited to, an Apple device, with a MAC address of: C8:D0:83:99:7A:25, which used an IP address of 192.168.80.108.  This device was used to connect to the Senate Guest WiFi Network, the .125 IP address, to edit the Wikipedia page for U.S. Senator 5.

39.    Investigators have reason to believe that the TARGET DEVICE(S) are currently located at the following locations: (1) the PREMISES, that is, XXX XXX XXXX Ave., XX, #XXX, Washington, D.C. 20001; (2) the STORAGE UNIT, that is, storage unit #XX, which is located on the third floor of XXX XXX XXXX Avenue, XX, Washington, D.C. XXXXX; and/or (3) the VEHICLE, that is, the 2017 Hyundai Elantra Sedan bearing the VIN number XXXXXXXXXXXXXXXXX and Washington, D.C. tag XXXXXX.  Investigators believe that

the TARGET DEVICE(S) will be stored either at the PREMISES or VEHICLE because based on my training and experience, I know that individuals who use electronic and digital devices generally transport and store these devices either in their homes or their vehicles. Additionally, the STORAGE UNIT was observed to contain digital devices to include a computer and computer monitor. As such, I know that it is reasonable to believe that the TARGET DEVICE(S) are currently stored among the other digital devices found in the STORAGE UNIT.

## TECHNICAL TERMS

Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.   "Digital device," as used herein, includes the following three terms and their respective definitions:

1)   A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)   "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical,

and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking,

sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

15

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The Internet is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

k.      A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant

client inbound traffic arriving from the Internet.   A router usually retains logs for any devices using that router for Internet connectivity.   Routers, in turn, are typically connected to a modem.

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.   For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.   Domain names are typically strings of alphanumeric characters, with each level delimited by a period.   Each level, read backwards – from right to left – further identifies parts of an organization.   Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and, .edu for educational organizations.     Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.   Additional levels may exist as needed until each machine is uniquely identifiable.   For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website.

n.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet.   In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.   A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.   A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP

address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.    One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

      i.      When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software.  The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

      ii.      Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

      o.      "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-

hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p.     "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.     "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

40.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the PREMISES, in whatever form they are found. One form in which such items might be found is data stored on one or more digital devices. Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers;

personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the PREMISES, there is probable cause to believe that the items described in Attachment B will be stored in the such device(s) for at least the following reasons:

a.      Individuals who engage in criminal activity, such as the criminal activity at issue here, including 18 U.S.C. §§ 119 (Making Public Restricted Personal Information); 875(d) (Threats in Interstate Communications); 1030(a)(3) (Unauthorized Access of a Government Computer); 1028A (Aggravated Identity Theft); and 1512(b)(3) (Witness Tampering), and 22 D.C. Code §§ 801(b) (Second Degree Burglary) and 3302(b) (Unlawful Entry), use digital devices, like the TARGET DEVICE(S), to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the TARGET DEVICE(S), documents and records relating to their illegal activity, which can include logs of online "chats" with co-conspirators; email correspondence; text or other "Short Message

Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

b.      Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.      Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not

allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

41.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used

it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs,

photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

       c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

       d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

       e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

       f.      I know that when an individual uses a digital device to violate, *inter alia*, 18 U.S.C. §§ 119, 1030(a)(3), 1028(a), 875(d), and 1512(b)(3), the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage

medium for evidence of the crime.  The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The digital device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

42.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.     Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which

means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.  Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

       e.     Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before

examination of the device.   Additionally, most smart phones and other mobile devices require passwords for access.   For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.   Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.   Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.   For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.    Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.   Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.   In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

43.     The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

a.     Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.     Upon securing the PREMISES, VEHICLE, and STORAGE UNIT, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices, within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review.  For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES, VEHICLE, and STORAGE UNIT.  The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

2.     The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their

precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

      3.    In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.   In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.   Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## **AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT**

    44.    Law enforcement personnel will commence the execution of this search and seizure warrant upon the PREMISES, VEHICLE, and STORAGE UNIT during daytime hours (between 6:00 a.m. and 10:00 p.m.), as early as practicable.   It is anticipated that law enforcement personnel will attempt to image or copy digital information from certain servers on the PREMISES, VEHICLE, and STORAGE UNIT rather than remove those servers from the premises.   Such onsite imaging or copying will minimize disruptions to the use of those servers.

    45.    From my training and experience, I know that imaging or copying information from servers on the PREMISES, VEHICLE, and STORAGE UNIT can be substantially delayed by various factors which cannot be ascertained or sometimes even anticipated until the actual

execution of the warrant.  There may, for example, be no system administrator available, willing, or able to assist law enforcement personnel to narrow the search by identifying the virtual or dedicated server(s) on the PREMISES, VEHICLE, and STORAGE UNIT, or the server folders, containing information within the scope of the warrant.  There may be terabytes or even petabytes of information to be copied.  The network architecture of the servers on the PREMISES, VEHICLE, and STORAGE UNIT or the configuration of the server hardware may affect and delay data transfer speeds.  Data encryption and password protections may also significantly delay imaging or copying as law enforcement personnel seek to identify necessary passwords without which imaging or copying on the PREMISES, VEHICLE, and STORAGE UNIT would likely be unachievable.  Under some circumstances, data downloads can be interrupted by network or hardware malfunctions or other network or hardware attributes which often necessitates restarting the data downloads from the beginning.

46.     For all of the foregoing reasons, I respectfully submit good cause exists, pursuant to Fed. R. Crim. P. 41(e)(2)(A)(ii), for authorization to execute the search warrant at any time of the day or night.  Law enforcement personnel will commence executing the warrant as near to 6:00 a.m. as practicable.  However, given the myriad factors that that may prevent completion of the search and seizure by 10:00 p.m., including those described above, I request authorization to continue the warrant execution past 10:00 p.m., if necessary, until completion of the warrant execution.  Suspending the execution at 10:00 p.m. until 6:00 a.m. could compromise data downloads in progress, render stored data subject to alteration or deletion, require securing the PREMISES during the intervening hours, and prolong the disruption of access to, and use of, the PREMISES and the digital devices being searched.

## CONCLUSION

47.    I submit that this affidavit supports probable cause for a warrant to search the

PREMISES, VEHICLE, and STORAGE UNIT described respectively in Attachments A-1, A-2,

and A-3 and to seize the items described in Attachment B.


Respectfully submitted,


_____
Jason Bell
Captain
United States Capitol Police


Subscribed and sworn to before me on October 4, 2018:


_____
DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE
  FOR THE DISTRICT OF COLUMBIA